(61 App. Div. 119.)

### VEAZEY v. ALLEN et al.

(Supreme Court, Appellate Division, First Department.  May 10, 1901.)

CONTRACTS—PROCURING LEGISLATION—PUBLIC POLICY.

    Where plaintiff undertook to procure the passage of a resolution which would result in congressional investigation of a certain corporation, so as to cause a depreciation in the value of its corporate securities, in consideration of which defendant stockbrokers were to speculate on their own account in the shares of the investigated corporation for the mutual profit of themselves and plaintiff, the contract was void as against public policy.

Appeal from judgment on report of referee.

Action by James N. Veazey against Henry Allen and others. From a judgment for defendants, plaintiff appeals.  Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, PATTERSON, and INGRAHAM, JJ.

Edward Lauterbach, for appellant.

Charles F. Brown, for respondents.

INGRAHAM, J.  Four causes of action are alleged in the complaint.  Three of them relate to speculations in stock of a corporation known as the Distilling & Cattle-Feeding Company, and the fourth relates to a speculation in stock of the American Sugar-Refining Company, two corporations whose securities were dealt in on the New York Stock Exchange.  The question presented on each of these four causes of action is the same, and it will only be necessary to call specific attention to the first cause of action.  The plaintiff therein alleges that on or about January 5, 1893, the defendant Henry Allen, acting on behalf of the firm of Henry Allen & Co., at the city of New York, entered into a contract or agreement with the plaintiff whereby he "contracted and agreed that if this plaintiff would report and communicate to the said firm of Henry Allen & Co. such facts and circumstances as might come to the knowledge of the plaintiff by virtue of his engagement in an undertaking upon which he was about to enter, which would or might in any way tend to affect the market value of the stock of the Distilling & Cattle-Feeding Company, that they, the said Henry Allen and Edward L. Norton, composing the firm of Henry Allen & Co., the defendants herein, would sell for the account of this plaintiff, and in consideration of such services aforesaid, and advance all margins necessary thereto, three thousand (3,000) shares of Distilling & Cattle-Feeding Company stock, and whenever the said stock should decline to such a point as, in their judgment, might render it advisable, would buy, and thereby cover said sales at a profit, and that they would account to this plaintiff, and pay to

him all such profits as might be made in the fall and decline of said stock." And the complaint alleges the performance of this contract by the plaintiff; that the market price of the said stock heavily declined; that the said defendants sold for and on account of the plaintiff, in accordance with the agreement aforesaid, 3,000 shares of the stock of the corporation, and upon such decline paid to this plaintiff the sum of $6,237.81, which the defendants represented to be the true net profits realized on account of said sale or sales; that the said sum, however, was not the true net result of the operations of the defendants for and on account of the plaintiff under the said contract, but that the net profits thereon realized were largely in excess of the said amount; that the plaintiff has repeatedly demanded of the defendants an accounting of their operations, but that the defendants have persistently refused, and still refuse, to render to the plaintiff an accounting thereof; and that the defendants are indebted to the plaintiff in a large sum of money as a balance due upon their transactions under the said contract, the exact amount of which balance now due this plaintiff is unable to ascertain without a true and complete accounting from the said defendants. The other causes of action allege similar contracts made at subsequent periods; and the relief demanded is that the defendants be compelled to account for all the sales made by them in their dealings and transactions of the stock of the Distilling & Cattle-Feeding Company and in the stock of the American Sugar-Refining Company, under the contract set forth in the said four separate and distinct causes of action.

We have here alleged a co-partnership or joint adventure for speculating in stocks. There is not an allegation in this complaint that it was understood that the defendants were to deal in these stocks in any other way than as pure gambling transactions. They were to sell stocks which they did not have, with the expectation of buying them back at a cheaper price, and the profits in which plaintiff was interested were to be obtained by a purchase of the stocks at a less price than that at which they had been sold. The defendants were to sell the stock, assume all the responsibility of the transactions, and account to the plaintiff for the profits. The plaintiff was to report and communicate to the defendants such facts and circumstances as might come to his knowledge by virtue of his engagement in an undertaking upon which he was about to enter. Thus, according to the complaint, it was the communication of information by the plaintiff to the defendants which was the sole service that he was to render to them, and for which the defendants were to sell this stock, and assume the large responsibilities that had to be assumed to supply the margins to carry out the transactions, and the profits arising from such speculation were to be paid to the plaintiff. The contract as thus alleged is so unusual, and the consideration to be furnished by the plaintiff so slight and unsubstantial, that it is at once suggested that it was intended to cover up some transaction that the pleader felt was dangerous to openly avow. That a person who had been a traveling salesman for a firm of whisky dealers, which position he had left, should be

in a position to furnish such information about facts and circumstances that might come to his knowledge, by virtue of his engagement in an undertaking upon which he was about to enter, as to induce a firm of stockbrokers to agree to enter into such a speculation as is here alleged, is certainly most surprising, and at once suggests that back of this allegation there were other and different services to be performed by the plaintiff.    The testimony of the plaintiff discloses what the real agreement between these parties was, and what it was that the plaintiff was to do to entitle him to the benefit of such a contract.    These contracts upon which the various causes of action are based are alleged in the complaint to have been made upon the 5th and 17th of January and the 1st of February, 1893.    The plaintiff testified that prior to that time he had been a traveling salesman for a firm of whisky dealers in Cincinnati, Ohio, and that upon the 1st of January, 1893, he had severed his relations with that firm; that prior to that time he had known of the organization of the corporation called the Distilling & Cattle-Feeding Company, which had largely absorbed the distillers of whisky, and monopolized the manufacture and sale of that article.    The plaintiff had considered that the method of doing the business adopted by this corporation tended to make his employment difficult, and he had consulted with various people relative to the advisability of taking some proceedings to expose the methods of doing business adopted by this corporation.    He seems to have met with but little success prior to the 1st of January, 1893.    Among others with whom he had discussed this proposition was a Mr. Walton and his father-in-law, a Judge Veazey.    In the autumn of 1892 Mr. Walton suggested that an investigation of this corporation would have an effect upon the price of its securities upon the stock market, and subsequently proposed to plaintiff that he should come to New York to meet a Mr. Flagg before engaging in the enterprise: "that he might have something to suggest which would be beneficial to me."    Plaintiff came to New York, was introduced to Flagg, and Mr. Flagg "told me that there probably would be an opportunity to make considerable money out of the decline of the Distilling & Cattle-Feeding Company's stock, providing the representations that I made in regard to the conditions of that company were true, and that they should be exposed; and he thought it would be well for me to see and consult with some broker here in New York.    Told him that I was ready to do so."    The plaintiff was introduced to the defendant Allen by Flagg, the object of this introduction being to bring about a financial connection which would result in speculation in stocks which would be a benefit to the plaintiff.    The plaintiff then had his interview with Allen on January 5th.    At that time there was no investigation of this corporation pending or proposed.    The plaintiff's account of this conversation with Allen is as follows:

"I told Mr. Allen that there was to be an investigation of the Whisky Trust. I anticipated my ability to go over there and stir up this question, which was a very serious one, affecting trade interests in general all over the country. What I said to Mr. Allen was said in anticipation of my being able to bring about a congressional investigation of the affairs of the Whisky Trust.    I was to do what I could to promote such an investigation.    I agreed with Mr. Allen

to do that. I was to give such information as I had regarding the operations of this corporation to any member of congress who could introduce a resolution for an investigation of this and other corporations. I meant to see members of congress about it, and to solicit their action, and I intended to do what I could to get this resolution adopted by congress."

After the plaintiff had thus testified, a letter was shown him which he had written to the New York Stock Exchange protesting against Allen's being readmitted as a member of the exchange. In that letter the plaintiff says he has a large claim against Allen, based upon the following facts: "Mr. Allen agreed with me early in January last that in consideration of my proceeding to Washington, and inducing an investigation by congress of the affairs and business of the Distilling & Cattle-Feeding Company, commonly known as the 'Whisky Trust,' that he would sell for me and my associates some 3,000 shares of the stock of the company, with an understanding that, in case my efforts in that regard resulted in a break in price of said stock, the profits realized should belong to me and my associates." That in pursuance of this agreement the plaintiff "went to Washington and instituted the investigation. I furnished at my own efforts and expense the testimony in that inquiry, and the result was an immediate fall in price of D. C. F." And the plaintiff was asked whether that was a correct statement of his arrangement, to which he answered, "Substantially so."

In the light of this testimony, there can be no question as to the service that it was understood the plaintiff was to perform as a consideration for the defendant's agreement to institute this speculation. What the plaintiff undertook to do was to procure the passage of a resolution by means of which there would result a congressional investigation, which would cause a serious depreciation in the value of the securities of this corporation; and a speculation was to be carried on by the defendant, which would result in profit when this contemplated depreciation in the securities of the corporation attacked took place. The nature of this speculation is disclosed by the plaintiff. He says:

"It contemplated the sale of those stocks short, and covering on the decline. It did not contemplate anything else. The profits were to be made in that way, and in that way only. That is my belief about it. I am quite sure that in my first conversation with Mr. Allen he promised to sell 3,000 shares of stock for me, and cover on the decline. That was the precise number. On the second transaction he proposed to repeat the former transaction, which was 3,000 shares."

Now, this transaction contemplated an illegal, if not a criminal, combination or conspiracy. It contemplated the procuring by the plaintiff of a congressional investigation for the purpose of injuring a corporation and depreciating the value of its securities. It further contemplated a gambling transaction, pure and simple, by which the parties were to sell, or agree to sell, stock of the corporation, with the hope of covering upon the decline, so that there would be a profit in the transaction. There was no suggestion in this arrangement or agreement that the service was to be performed in obtaining legislation which the law recognizes as valid. It is not claimed that this defendant had any interest in this corporation or its securities, or in

any other corporation which could possibly be benefited by any legislation that the plaintiff was employed to promote. The plaintiff, having made this agreement, by which he was to profit if he could procure the passage of an investigating resolution by either of the houses of congress, went to Washington and secured an introduction to Mr. Burrows, a prominent member of congress from Michigan. He made representations to Mr. Burrows which satisfied him that the matter should be investigated, and, at the instigation of plaintiff, Mr. Burrows introduced in the house of representatives a resolution of investigation. It is unnecessary to state that the plaintiff carefully concealed from Mr. Burrows the fact of his having such a contract as that testified to by him, or that the investigation was instigated for the purpose of speculation in the securities of the company attacked. Nor is Mr. Burrows' declaration disputed, that, had he known that the plaintiff was connected with a speculation of this character, he would have refused to introduce the resolution; and the plaintiff made no suggestion to Mr. Burrows, or, so far as appears, to any one else, of any remedial legislation. All he wanted was an investigation through which he could attack the company, and which would cause a depreciation of its securities. When this resolution had passed it was referred to a subcommittee of the judiciary committee of the house of representatives. The testimony of the chairman of this subcommittee was before the referee. He testified that the plaintiff appeared before that subcommittee; had repeated conversations with the chairman thereof; testified as a witness; was present during all the investigation; prompted and questioned the witnesses, and urged the investigation; made suggestions to the chairman; furnished the names of witnesses, advising as to matters to be brought before the committee, and questions which should be put to witnesses, and especially to Mr. Greenhut, president of the Cattle-Feeding & Distilling Company; and, in short, he performed the duties of the prosecuting witnesses during the investigation. The plaintiff also testified to his participation in procuring this investigation, and in pushing it on during its progress; and, from his telegrams to the defendant during the time that this investigation was in progress, it is quite evident that not only had the investigation been instigated by him, but that he was its principal promoter,—its instigator, prosecutor, and principal witness. After this investigation was at an end, the committee reported to congress; and, apparently, that was the end of the plaintiff's interest in the prosecution. He had procured the investigation which had depreciated the value of the stock of the corporation attacked, and, as that was evidently the sole object of the plaintiff, his interest in the matter ceased, and the sole result of the transaction was the testimony before the committee and its report.

This is the service that the plaintiff was to render; and the sole question is whether a contract which contemplates the procuring of legislative action, involving an attack upon a corporation for the purpose of making a profit by speculating in its stock, will be enforced in a court of justice. It is a general principle of the common law "that all agreements for pecuniary considerations to control the busi-

ness operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution" (Tool Co. v. Norris, 2 Wall. 49, 17 L. Ed. 871); and this principle has been applied wherever it appeared, either from the contract itself, or from the evidence dehors the contract, that the parties contemplated the rendition of such service, or the performance of acts tending thereto. As was said by Mr. Justice Field in the case last cited:

"The principle which determines the invalidity of the agreement in question has been asserted in a great variety of cases. It has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. Legislation should be prompted solely for considerations of the public good, and the best means of advancing it. Whatever tends to divert the attention of legislators from their high duties, to mislead their judgments, or to substitute other motives for their conduct than the advancement of the public interests, must necessarily and directly tend to impair the integrity of our political institutions. Agreements for compensation contingent upon success suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception."

It would be useless to call attention to the cases in which this principle has been applied, but, from the earliest time in the history of the common law, courts have refused to enforce contracts the tendency of which was against public morals; and in all the cases is the duty recognized of refusing to enforce any contract where there is a pecuniary advantage to be acquired, contingent upon the action of a legislative body. In Marshall v. Railroad Co., 16 How. 314, 14 L. Ed. 953, Mr. Justice Grier says:

"It is an undoubted principle of the common law that it will not lend its aid to enforce a contract to do an act that is illegal, or which is inconsistent with sound morals or public policy, or which tends to corrupt or contaminate, by improper influences, the integrity of our social or political institutions."

And after an examination of the authorities he continues:

"The sum of these cases is: (1) That all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislators, is void by the policy of the law. (2) Secrecy as to the character under which the agent or solicitor acts tends to deception, and is immoral and fraudulent; and where the agent contracts to use secret influences, or voluntarily, without contract with his principal, uses such means, he cannot have the assistance of a court to recover compensation."

This principle has been many times and uniformly enforced in this state. In Mills v. Mills, 40 N. Y. 543, 100 Am. Dec. 535, a contract to procure the passage of a law for the benefit of the defendant, whereby the plaintiff undertook to use his utmost influence and exertions to procure the passage of a law, was declared void as against public policy, as it was a contract leading to secret, improper, and corrupt tampering with legislative action. There the court say:

"It is not necessary to adjudge that the parties stipulated for corrupt action, or that they intended that secret and improper resorts should be had. It is enough that the contract tends directly to those results. It furnishes a

temptation to the plaintiff to resort to corrupt means or improper devices to influence legislative action. It tends to subject the legislature to influences destructive of its character, and fatal to public confidence in its action."

There is certainly nothing in Chesebrough v. Conover, 140 N. Y. 386, 35 N. E. 633, which tends to impair the force of this principle. In that case the rule is reasserted, but the judgment was affirmed because there was evidence from which the jury had found that the plaintiff was not employed to render, and did not render, lobby services; that it did not appear that he asked or solicited any member of the legislature to vote for the bills, or that he did anything except to explain them and request their introduction, and so much he could do without violating any public policy. And the late case of Dunham v. Pavement Co., 56 App. Div. 244, 67 N. Y. Supp. 632, which was again before the court on a motion for a reargument (57 App. Div. 426, 68 N. Y. Supp. 221), expressly reasserts this same principle. It was there held that as the contract, upon its face, was not tainted with illegality, it was a question for the jury to say whether or not the parties did contemplate illegal action by the plaintiff. Certainly nothing in that case was intended to, or did in the slightest degree, impair the general rule that any contract which has for its object the procuring of legislative action is void as against public policy. Applying this rule to the contract in question, it is quite clear that the parties contemplated that the plaintiff should procure a legislative investigation of this corporation by personal solicitation or by some other means, and, having procured such an investigation, should push it to the utmost extent, and that, for the purpose of obtaining a pecuniary advantage from this legislative action, the defendant should speculate in the securities of the corporation attacked; the profits of such speculation to be divided between the parties to the action. That this contract directly contemplated the procurement of legislative action by the plaintiff, and that the profit of the plaintiff was contingent upon his success in procuring such legislative action, is perfectly apparent, and comes directly within the principle to which attention has been called. We think this contract is condemned by every principle of public policy and morality, and that the learned referee quite correctly refused to go on with the case after the nature of the contract was disclosed.

The judgment should be affirmed, with costs. All concur.